THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MIGDALIA RAMOS,<br><br>             Plaintiff,<br>v.<br><br>ATTACHMATE CORPORATION, a<br>Washington Corporation, ATTACHMATE<br>CORPORATION EMPLOYEE BENEFITS<br>PLAN and CATHERINE SPICE, in her<br>official capacity as Plan and Claims<br>Administrator and Fiduciary,<br><br>             Defendants. | Civil Action No.:<br><br>FILED: JUNE 20, 2008<br>08CV3556<br>JUDGE ZAGEL<br>MAGISTRATE JUDGE COX<br>TG |

## COMPLAINT

Plaintiff, Migdalia Ramos ("Ramos"), by and through her attorney, Steven M. Laduzinsky, for her Complaint against Defendants, Attachmate Corporation, Attachmate Corporation Employee Benefits Plan and Catherine Spice, states as follows:

### INTRODUCTION

Ramos claims that Defendants, Attachmate Corporation Employee Benefits Plan and Catherine Spice denied Ramos medical benefits under Attachmate Corporation's Employee Benefit Plan. Ramos also claims that Defendant, Attachmate Corporation terminated her for exercising her rights under the employee benefit plan and in an effort to interfere with her rights under that plan, in violation of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132, 29 U.S.C. § 1133 and 29 U.S.C. § 1140.

### JURISDICTION AND VENUE

1.     Jurisdiction over the claims in this Complaint is conferred on this Court by 29 U.S.C. § 1132(e). This case presents a federal question under 28 U.S.C. §§ 1331 and 1343(a)(4).

2. Venue is proper in the United States District Court for the Northern District of Illinois pursuant to 28 U.S.C. § 1391 in that the events or omissions giving rise to Ramos's claim occurred in the Northern District of Illinois.

**PARTIES**

3. Ramos resides in the City of Berwyn, Cook County, Illinois and is a resident of the Northern District of Illinois.

4. Defendant, Attachmate Corporation ("Attachmate") is organized and exists under the laws of the State of Washington and is registered to do business in the State of Illinois. Attachmate maintains and operates a business facility and conducts business and is subject to personal jurisdiction in the Northern District of Illinois.

5. Defendant Attachmate Corporation Employee Benefits Plan (the "Plan") is an employee benefits plan as defined under ERISA, made available to Ramos through her employment with Attachmate. The Plan provides and administers medical and other employee benefits for Attachmate employees in Cook County, Illinois, including Ramos, and is subject to personal jurisdiction in the Northern District of Illinois. The Plan employed P5 Electronic Health Services, Inc. ("P5") as its claims administrator and payor. The Plan also employed Trusteed Plans Service Corporation ("Trusteed") and Health Care Strategies, Inc. ("Health Care") as claims processors, reviewers, approvers and administrators. At all relevant times alleged in this Complaint, P5, Trusteed and Health Care were agents of and authorized to act on behalf of and bind the Plan to approve and pay medical benefits to Plan beneficiaries, including Ramos.

6. Defendant, Catherine Spice ("Spice") is the Plan and Claims Administrator and Fiduciary with respect to the Plan and is responsible for all decisions regarding eligibility for benefits and benefits determinations. Spice administers and makes decisions related to the Plan

2

beneficiary's claims for medical and other benefits, including Ramos, and other beneficiaries residing in the Northern District of Illinois.

## FACTS

7. On September 9, 1999, Ramos was hired as an Office Manager/Administrator for Attachmate's Chicago Office located at 8410 W. Bryn Mawr, Chicago, Illinois.

8. From September 1999 to June 25, 2003, Ramos performed the duties and carried out the responsibilities assigned to her as an Office Manager/Administrator for Attachmate's Chicago Office.

9. From September 1999 to June 3, 2003, Ramos was never subjected to any disciplinary warning or action as she carried out the duties and responsibilities assigned to her as an Office Manager/Administrator for Attachmate's Chicago Office.

10. From September 1999 to August 2002, Ramos suffered from morbid obesity which elevated her blood pressure, caused headaches and borderline diabetes directly impacting her physical health.

11. Prior to September 1999 and through August 2002, Ramos had tried and participated in weight loss, diet, exercise and medical programs to lose weight, decrease her morbid obesity, decrease her blood pressure, headaches and borderline diabetes. Ramos's family history also contained members who had suffered death and serious health issues related to morbid obesity, high blood pressure and diabetes.

12. In July and August, 2002, Ramos's physician recommended as a result of Ramos's unsuccessful attempts to lose weight and her family history that she undergo a gastric bypass procedure ("surgical procedure").

13. At all relevant times from August 2002 through June 2003, P5 was the Plan's authorized agent to approve coverage and payment of medical claims of the Plan's beneficiaries, including Ramos.

14. In August 2002, Ramos contacted a Stephanie at P5 to obtain pre-service claim approval and insurance coverage for a gastric bypass procedure. Stephanie at P5 advised Ramos that the Plan would only cover the surgical procedure if it was determined by Ramos's physicians to be medically necessary.

15. Subsequent to Ramos's August 2002 communication with Stephanie at P5, Ramos consulted with her primary care physician, Brian Ing, M.D., to further discuss the surgical procedure.

16. During August 2002, Dr. Ing's office contacted Stephanie at P5 to obtain pre-service claim approval of and payment for the surgical procedure. Dr. Ing's office was advised that Ramos would have to be medically cleared for the surgical procedure by each of Ramos's physicians, including but not limited to her urologist, cardiologist and the surgeon.

17. Dr. Ing informed Ramos of the Plan's requirement. Ramos then called Stephanie at P5, who advised Ramos that she would have to see each of her physicians and be medically cleared by each of them before the Plan would approve and pay for the surgical procedure.

18. Ramos, at the instruction of Stephanie at P5, scheduled and attended appointments with her primary care physician, cardiologist, urologist and John Brems, M.D. the surgeon.

19. On or about September 6, 2002, a Bariatric Patient Evaluation and Consultation was prepared at Loyola University Medical Center assessing whether Ramos was a good candidate for and that the surgical procedure was medically necessary.

4

20. On or about September 6, 20002, Dr. Brems also advised Ramos that he would not perform the surgical procedure unless Ramos's benefit plan administrator would approve coverage and payment for the surgical procedure. Additionally, Ramos did not have the financial resources to pay out of pocket for the surgical procedure and sought P5's pre-service claim approval for the surgical procedure.

21. Subsequent to September 6, 2002, Loyola University Medical Center and John Brems M.D., advised P5 that the surgical procedure was medically necessary for Ramos.

22. On or about September 25, 2002, after receiving the Loyola University Medical Center and Dr. Brems's determination that Ramos's surgical procedure was medically necessary, P5 informed Dr. Brems and Ramos that P5 required Ramos to obtain a psychiatric consult with and approval from a Gastan Sharma, M.D. of Loyola University Medical Center that Ramos was psychiatrically able to handle the surgical procedure.

23. On or about October 14, 2002, Ramos attended a psychiatric consult with Dr. Sharma of Loyola University Medical Center.

24. Subsequent to October 14, 2002, Dr. Sharma of Loyola University cleared Ramos, from a psychiatric perspective, for the surgical procedure.

25. On or about October 22, 2002, Loyola University Medical Center and/or Dr. Brems sent Dr. Sharma's Psychiatric evaluation to the attention of a Carolyn at P5.

26. On or about October 22, 2002, Carolyn of P5 contacted Loyola University Medical Center and/or Dr. Brems to approve coverage and payment for Ramos's surgical procedure Case #56718 and a three (3) day hospital stay for Ramos.

27. On November 6, 2002, Ramos underwent the surgical procedure at Loyola University Medical Center.

5

28. On or about November 8, 2002, Loyola University Medical Center and Dr. Brems communicated with P5 requesting approval of an additional one (1) day hospital stay for Ramos.

29. On November 8, 2002, P5, Trusteed and/or Health Care approved Loyola University Medical Center and Dr. Brems's request for the additional one (1) day hospital stay for Ramos.

30. As a result of the surgical procedure, Ramos incurred the following medical bills:

        Loyola University Medical Center      $26,152.00

        Loyola University Physicians Foundation   $13,504.80

31. Loyola University Medical Center and Loyola University Physicians Foundation submitted these bills to the Plan, P5, Trusteed and/or Health Care for payment.

32. In addition to the medical bills in paragraph 30, Ramos has incurred other medical bills related to the surgical procedure.

33. In January 2003, Ramos started receiving telephone calls from Loyola University Medical Center, Dr. Brems and other medical providers that the Plan, P5, Trusteed and Health Care had not paid the medical bills associated with the surgical procedure. Ramos received these telephone calls at Attachmate's Chicago Office.

34. Subsequently in January and February 2003, Ramos received several notifications advising her for the first time that the surgical procedure would not be paid by the Plan, P5, Trusteed or Health Care.

35. From January 2003 through June 2003, Ramos received repeated additional telephone calls from Loyola University Medical Center, Dr. Brems's office as well as other medical providers and collection agencies, that the Plan, P5, Trusteed and/or Health Care had not

paid the medical bills associated with the surgical procedure. Ramos received these telephone calls at Attachmate's Chicago Office.

36. From January 2003 through June 2003, Attachmate's Chicago Office's supervisory staff was aware of Ramos's efforts to pursue the payment of her medical bills from the Plan through conversations with Ramos and telephone calls the supervisory staff received from Loyola University Medical Center, Dr. Brems as well as other medical providers and collection agencies

37. In February 2003, Ramos communicated with Trusteed seeking an explanation and review of the denial of the payment of the medical expenses associated with the surgical procedure. Trusteed never responded to Ramos's communication, never conducted a review of the denial, nor provided her with an explanation why her claim for medical benefits had been denied or of her ERISA rights.

38. In April 2003, Ramos communicated with Attachmate's Human Resource's Department and the Plan seeking a review of the denial of the payment of the medical expenses associated with the surgical procedure and seeking further assistance. Attachmate's Human Resources Department and the Plan never responded to her communication nor provided her with an explanation why her claim for medical benefits had been denied, never conducted an investigation and review of the denial nor provided Ramos with an explanation of her ERISA rights.

39. In May 2003, Ramos sought the assistance of the Illinois Attorney General's Office and the Illinois Department of Insurance to obtain the Plan's payment of her medical bills related to the surgical procedure. The Illinois Attorney General's Office and the Illinois Department of Insurance on behalf of Ramos communicated with Attachmate and the Plan seeking payment of Ramos's medical bills related to the surgical procedure, an explanation why

7

her claim for medical benefits had been denied, that an investigation or review of the denial be conducted. Attachmate and the Plan never provided an explanation why her claim for medical benefits had been denied, never conducted an investigation or review of the denial and never provided Ramos with a complete explanation of her ERISA rights.

40. Shortly after requesting an explanation and review of the denial from the Plan and Attachmate's Human Resources Department as to why her claim for medical benefit had been denied on or about June 3, 2003, Ramos learned from supervisory staff in Attachmate's Chicago Office that Attachmate's Human Resources Department had requested that her entire personnel file and time records be sent to the home office for review.

41. On or about June 15, 2003, Attachmate sent a representative from Attachmate's Human Resources Department and a Regional Manager to Attachmate's Chicago Office to interview Ramos.

42. During the interview, Attachmate's Human Resources Representative and Regional Manager acknowledged that Attachmate was aware that Ramos was pursing the payment of her medical bills for the surgical procedure.

43. Ramos was then advised that she was being "investigated" for missing office supplies and eight (8) hours of overtime pay that she received.

44. On June 25, 2003, Attachmate terminated Ramos's employment as its Office Manager/Administrator for Attachmate's Chicago Office located in Illinois.

45. Attachmate's reasons for terminating Ramos were that size AA and AAA batteries were missing, and that an Attachmate Chicago Office supervisor's signature appeared on Ramos's time card but the supervisor did not recall when he actually signed the time card.

46. Attachmate's reasons for terminating Ramos were fabricated and unsubstantiated and were designed to cover Attachmate's true reason for terminating Ramos that being Ramos's

8

pursuit of her rights under ERISA to obtain payment of her medical expenses related to the surgical procedure.

47. As of the date of the filing of this action, Ramos's medical expenses incurred as a result of the surgical procedure have not been paid by the Plan. Ramos has been subject to attempts to collect payment of these medical expenses from medical providers and collection agencies.

48. On September 3, 2006, Loyola University Physicians Foundation filed suit in the Circuit Court of Cook Count Illinois entitled *Loyola University Physicians Foundation v. Migdalia Ramos*, 06 M1 168456 against Ramos seeking to collect $13,926.00 representing the outstanding balance of some of the medical bills Ramos incurred related to the surgical procedure. This action remains pending and undetermined. Ramos has been required to retain counsel and defend this action related to the Plan's failure and refusal to pay the outstanding bills.

### COUNT I
### (ERISA WRONGFUL DENIAL OF BENEFITS)
### vs. The Plan pursuant to §502 and §503

49. Ramos respectfully incorporates by reference paragraphs 1 through 48, inclusive as if fully set forth herein in paragraph 49 of Count I.

50. The Plan is a covered employee benefit plan under ERISA.

51. Ramos was a beneficiary of the Plan as defined under ERISA.

52. At all times relevant, Ramos was a participant in the Plan as defined by ERISA.

53. At all times relevant, there was in full force and effect 29 U.S.C. §1132(a)(1)(B), (§502 of ERISA) which provides that as follows:

> A civil action may be brought . . .

9

(1)(B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.

54. At all times relevant, there was in full force and effect 29 U.S.C. § 1133 (§503 of ERISA which provides as follows:

> In accordance with regulations of the Secretary, every employee benefit plan shall:
>
> (1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant; and
>
> (2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

55. The Plan failed to provide to Ramos medical benefits due to her under the terms of the Plan.

56. The Plan denied Ramos medical benefits due to her under the terms of the Plan without conducting any investigation or review of her claim, after approving coverage for the treatment and without minimum procedural safeguards.

57. The Plan intentionally denied Ramos's right to medical benefits under the Plan.

58. The Plan's conduct alleged herein purposefully interfered with the Ramos's right to medical benefits under the Plan.

59. The Plan's actions in denying Ramos's right to medical benefits violate §502 and §503 of ERISA.

60. After Ramos's claim for benefits under the Plan was denied, the Plan failed to provide the specific reasons for such denial in accordance with 29 U.S.C. §1133.

61. Since February of 2003, Ramos has repeatedly sought an explanation and review of why her benefits have been denied under the Plan, and neither Catherine Spice, as Plan

10

Administrator, the Plan or its authorized agents P5, Trusteed and/or Health Care have provided a response in violation of 29 U.S.C. §1133.

62. Pursuant to 29 U.S.C. §1133, Ramos is entitled to a full and fair review of the decision to deny her claim for benefits.

63. At no time did the Plan or Spice, as Plan Administrator, provide a specific reason for denying Ramos's claim for benefits.

64. At no time did the Plan or Spice, as Plan Administrator, provide Ramos an opportunity for a fair review by an appropriate named fiduciary regarding her claim for benefits, or advise Ramos of her rights under ERISA. Despite repeated requests, at no time was Ramos provided an explanation for the denial of benefits or given an opportunity to review documents relating to the Plan's denial of benefits.

65. At no time did the Plan or Catherine Spice, as Plan Administrator, provide any meaningful review procedure to Ramos. At no time was Ramos told how to file an appeal of The Plan's decision to deny benefits or told that any review procedure was available.

66. Ramos has been denied benefits without any right of appeal. Pursuit of additional administrative remedies, if any, would be futile, inadequate and would result in irreparable harm to Ramos. Pursuing any existing internal review of Ramos's denial of benefits would be futile based on The Plan's repeated refusal to timely provide information regarding the claim, and Attachment's termination of Ramos after requesting payment of her surgical procedure under the Plan and seeking enforcement of her ERISA rights through the Illinois Attorney General's office and Department of Insurance.

67. Ramos has complied with all administrative prerequisites to filing this Complaint.

11

68.     Ramos is entitled to the payment of her claim for medical benefits denied to her, and a finding in her favor for all medical benefits available under the Plan.

WHEREFORE, Plaintiff, Migdalia Ramos, respectfully prays for judgment against the Defendant, ATTACHMATE CORPORATION EMPLOYEE BENEFITS PLAN as follows:

- a. A declaratory judgment that the Plaintiff in entitled to medical benefits and a review of the denial of her claim under the terms of the Plan;

- b. Defendant be ordered to provide Plaintiff's medical benefits under the terms of the Plan, retroactively, plus interest, for the benefits period;

- c. An award of compensatory damages in an amount determined by the Court;

- d. That Plaintiff recover her reasonable attorney's fees including litigation expenses and costs;

- e. That Plaintiff recover prejudgment interest; and

- f. Such other relief as the Court deems proper and just.

### COUNT II
### (ERISA BREACH OF FIDUCIARY DUTY)
### vs. the Plan and Spice pursuant to §502

69.     Ramos respectfully incorporates by reference paragraphs 1 through 68, inclusive as if fully set forth herein in paragraph 69 of Count II.

70.     At all times relevant, there was in full force and effect 29 U.S.C. §1132(a)(3), (§502 of ERISA) which provides that a civil action may be brought to enforce the provision of ERISA and the terms of the Plan.

71.     The Plan and Fiduciary failed to provide to Ramos medical benefits due to her under the terms of the Plan.

72. The Plan and Fiduciary denied Ramos medical benefits due to her under the terms of the Plan without conducting any investigation or review of her claim, after approving coverage for the treatment and without minimum procedural safeguards.

73. The Plan and Fiduciary intentionally denied Ramos's right to medical benefits under the Plan.

74. The Plan and Fiduciary's conduct alleged herein purposefully interfered with the Ramos's right to medical benefits under the Plan.

75. The Plan Administrator abused her discretion in denying Ramos's medical claim without investigation or review, after approving coverage for the treatment and without minimum procedural safeguards provided by ERISA.

76. The Plan and Fiduciary's actions in denying Ramos's right to medical benefits violate ERISA.

77. At no time did the Plan or Spice, as Plan Administrator, provide Ramos an opportunity for a fair review by an appropriate named fiduciary regarding her claim for benefits, or advise Ramos of her rights under ERISA. Despite repeated requests, at no time was Ramos provided an explanation for the denial of benefits or given an opportunity to review documents relating to the Plan's denial of benefits.

78. At no time did the Plan or Catherine Spice, as Plan Administrator, provide any meaningful review procedure to Ramos. At no time was Ramos told how to file an appeal of The Plan's decision to deny benefits or told that any review procedure was available.

79. Ramos has been denied benefits without any right of appeal. Pursuit of additional administrative remedies, if any, would be futile, inadequate and would result in irreparable harm to Ramos. Pursuing any existing internal review of Ramos's denial of benefits would be futile based on The Plan's repeated refusal to timely provide information regarding the

claim, and Attachment's termination of Ramos after requesting payment of her surgical procedure under the Plan and seeking enforcement of her ERISA rights through the Illinois Attorney General's office and Department of Insurance.

80. Ramos has complied with all administrative prerequisites to filing this Complaint.

81. Ramos is entitled to the payment of her claim for medical benefits denied to her, and a finding in her favor for all medical benefits available under the Plan.

WHEREFORE, Plaintiff, Migdalia Ramos, respectfully prays for judgment against the Defendants, ATTACHMATE CORPORATION EMPLOYEE BENEFITS PLAN and CATHERINE SPICE, in her official capacity as Plan and Claims Administrator and Fiduciary, as follows:

   a. A declaratory judgment that the Plaintiff in entitled to medical benefits under the terms of the Plan;

   b. Defendants be ordered to provide Plaintiff's medical benefits under the terms of the Plan, retroactively, plus interest, for the benefits period;

   c. An award of compensatory damages in an amount determined by the Court;

   d. That Plaintiff recover her reasonable attorney's fees including litigation expenses and costs;

   e. That Plaintiff recover prejudgment interest; and

   f. Such other relief as the Court deems proper and just.

### COUNT III
### (ERISA INTENTIONAL CONDUCT BY ADMINISTRATOR)
### vs. Catherine Spice Pursuant to §502

82. Ramos respectfully incorporates by reference paragraphs 1 through 81, inclusive as if fully set forth herein in paragraph 82 of Count III.

83. At all times relevant, there was in full force and effect 29 U.S.C. 1132(c)(1)(B) (§502 of ERISA) which provides as follows:

> Any administrator . . . who fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish to a participant or beneficiary . . . by mailing the material requested to the last known address of the requesting participant of beneficiary within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in the amount of . . . $110 a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper.

84. Catherine Spice, as Plan Administrator, was and is required to provide Ramos with information pursuant to 29 U.S.C. 1024(b)(4).

85. According to 29 U.S.C. 1024(b)(4),

> (1) The administrator shall furnish to each participant, and each beneficiary receiving benefits under the plan, a copy of the summary plan description, and all modifications and changes referred to in section 102(a), 29 U.S.C.S. 1022(a):
>
> (A) within 90 days after he becomes a participant, or (in the case of a beneficiary) within 90 days after he first receives benefits, or
>
> (B) if later, within 120 days after the plan becomes subject to this part.

86. Since February of 2003, Ramos has not received a copy of the Plan description or modifications or changes to the Plan.

87. Ramos has made requests for such information to Spice and Spice has not provided Plan information as required by 29 U.S.C. 1024(b)(4).

WHEREFORE, Plaintiff, Migdalia Ramos, respectfully prays for judgment against the Defendant, CATHERINE SPICE, in her official capacity as Plan and Claims Administrator and Fiduciary, as follows:

    a. An imposition of fines and penalties be assessed against Catherine Spice as Plan Administrator;

    b. An award of sanctions; and

c. Any such other relief as the Court deems proper and just.

## COUNT III
### (ERISA RETALIATION/INTERFERENCE)
### vs. Attachmate Pursuant to §510

88. Ramos respectfully incorporates by reference paragraphs 1 through 87, inclusive as if fully set forth herein in paragraph 88 of Count III.

89. The Plan provides medical benefits to plan beneficiaries, including Ramos.

90. Attachmate is bound by the terms of that Plan.

91. As an Attachmate employee and a participant in the Plan, Ramos had a right to receive benefits according to the terms of the Plan.

92. At all relevant times, there was in full force and effect, 29 U.S.C. §1140 (§510 of ERISA) which provides in relevant part as follows:

> It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, this subchapter, section 1201 of this title, or the Welfare and Pension Plans Disclosure Act [29 U.S.C. 301 et seq.], or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan, this subchapter, or the Welfare and Pension Plans Disclosure Act.

93. Attachmate terminated Ramos for exercising her rights under the provisions of the Plan and for the purpose of interfering with her attainment rights available under the Plan.

94. At all relevant times, Ramos was qualified to perform her duties as Office Manager/Administrator for Attachmate's Chicago Office. At no time prior to Ramos's surgical procedure and request for payment of the surgical procedure under the Plan, did Attachmate discipline Ramos for any reason.

95. Only after Ramos repeatedly requested payment of the surgical procedure under the Plan and exercised her rights under the Plan and ERISA, did Attachment terminate Ramos.

16

96. Attachment terminated Ramos for the purpose of interfering with her right to seek payment of the surgical procedure under the Plan and enforcement of her rights provided for under ERISA.

WHEREFORE, Plaintiff, Migdalia Ramos, respectfully prays for judgment against the Defendant, ATTACHMATE CORPORATION, as follows:

 a. A declaratory judgment that the Plaintiff in entitled to medical benefits under the terms of the Plan;

 b. Defendant, Attachmate be ordered to provide Plaintiff's medical benefits under the terms of the Plan, retroactively, plus interest, for the benefits period;

 c. Defendant, Attachmate be ordered to reinstate Plaintiff to return to her former position or a position substantially similar to the one from which she was discharged, with full salary, seniority, and benefits running from the date of termination;

 d. Defendant, Attachmate be ordered to compensate, reimburse and make Plaintiff whole for all the benefits she would have received had it not been for Defendant, Attachmate's illegal action, including but not limited to back pay, benefits, bonuses, raises, training, promotions, and seniority, including all relief available under 29 U.S.C. § 1001, *et seq* and 29 U.S.C. § 1132;

 e. An award of compensatory damages in an amount determined by the Court;

 f. That Plaintiff recover her reasonable attorney's fees including litigation expenses and costs;

 g. That Plaintiff recover prejudgment interest; and

 h. Such other relief as the Court deems proper and just.

Respectfully submitted

MIGDALIA RAMOS

By: _____
One of her attorneys

Steven M. Laduzinsky
Law Offices of Steven M. Laduzinsky, P.C.
180 N. LaSalle Street, Suite 2108
Chicago, Illinois 60601
(312) 424-0700